**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DOUGLAS M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 3801** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Douglas M. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 7, 8). The parties filed cross-motions for summary judgment. (Docs. 11, 19). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's request for remand.

## BACKGROUND

### I.    Procedural History

Plaintiff applied for DIB and SSI on January 23, 2015, alleging disability since January 1, 2012 due to chronic obstructive pulmonary disease ("COPD") and bipolar

disorder.  (R. 15, 64, 82, 102-103, 118-119, 207, 214, 239).[1]  Born in May 1966, Plaintiff was 45 years old at the time of the alleged onset date (R. 31, 235), which is defined as a younger individual.  20 C.F.R. § 404.1563(c).  His date last insured was September 30, 2012.  (R. 17, 235).

The Social Security Administration denied Plaintiff's applications initially on August 19, 2015, and on reconsideration on December 22, 2015.  (R. 100-01, 129-30, 149-51, 153-55).  Plaintiff then requested a hearing, which was held before Administrative Law Judge ("ALJ") Carla Suffi on May 24, 2017, where Plaintiff was represented by counsel.  (R. 38-63, 157-58).  Both Plaintiff and Vocational Expert ("VE") Grace Gianforte testified at the hearing.  (R. 15, 38-63).

The ALJ denied Plaintiff's claims in a decision dated September 12, 2017.  (R. 12-37).  The ALJ found that Plaintiff's obesity, asthma and COPD, bipolar disorder, antisocial personality disorder, and history of substance abuse are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 17-22).  The ALJ concluded that Plaintiff was not disabled from his January 1, 2012 alleged onset date through the date of the decision because he retained the residual functional capacity ("RFC") to perform medium work with physical limitations not at issue here and mental restrictions, as described to the VE, and is capable of

---

[1]    Citations to the Certified Copy of the Administrative Record filed by the Commissioner (Doc. 10) are indicated herein as "R."  While the applications included in the record are dated March 17, 2015 (R. 207, 214), the determinations at all levels of review say the applications were filed on January 23, 2015.  (R. 15, 32, 64, 82, 102, 118).  This is consistent with Plaintiff's statement that he protectively filed the applications on January 23, 2015.  (Doc. 12, at 2).  The Commissioner's brief is silent on this point.

performing past relevant work and other jobs that exist in significant numbers in the national economy. (R. 15-16, 22, 30-32, 60-61).[2]

The Appeals Council denied Plaintiff's request for review on April 11, 2018 (R. 1-6), rendering the ALJ's September 2017 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff commenced this action on May 31, 2018 and now seeks reversal or remand, arguing that the ALJ: (1) improperly weighed the medical opinions; (2) omitted mental limitations from the hypothetical posed to the VE; (3) failed to consider the medical evidence; and (4) erroneously evaluated his subjective allegations of mental impairment.[3] As explained below, the Court concludes that this case must be remanded because the ALJ relied on opinion evidence that does not support the RFC and failed to account for all of Plaintiff's limitations in the RFC and corresponding hypothetical to the VE.

## II. Work and Medical History

Plaintiff has a general equivalency diploma. (R. 42, 240). He worked from 2002 to 2005 or 2006 as a homemaker and from 2008 to 2009 as a laborer. (R. 44-45, 240). He stopped working in 2009 for reasons unrelated to his impairments and has not worked at all since 2012. (R. 17, 22, 44, 239). Plaintiff was in the custody of the Illinois Department of Corrections ("IDOC") from October 2012 to January 2015. (*See* R. 460,

---

[2]  The ALJ acknowledged that, for the DIB application, Plaintiff was required to establish disability on or before the date last insured of September 30, 2012. (R. 15, 29). The ALJ did not separately address the DIB and SSI applications, however, and generally concluded that Plaintiff was not under a disability from the alleged onset date of January 1, 2012 through the date of the decision. (R. 16, 32).

[3]  Plaintiff generally references some physical impairments (Doc. 12, at 3, 5), but focuses his arguments on mental impairments. Accordingly, the Court considers only Plaintiff's mental impairments.

517). Plaintiff alleges disability beginning January 1, 2012, and his date last insured for purposes of DIB was September 30, 2012. (R. 15, 17, 64, 82, 102-103, 118-119, 207, 214, 235, 239). The bulk of Plaintiff's treatment records are from the period of his incarceration from October 2012 to January 2015; the record does not include treatment records before this period and includes only very limited records after his release.

While incarcerated, in October 2012, a psychiatrist diagnosed Plaintiff with bipolar disorder, assigned a Global Assessment of Functioning ("GAF") score of 50, and prescribed observation and medications. (R. 459).[4] Several days later, a psychologist performed an intake evaluation of Plaintiff, noted variable affect but otherwise normal findings, referred Plaintiff for continued mental health services, and concluded that he "seems okay for a general population institution." (R. 460). In December 2012, another psychologist performed a mental health screening, assigned a GAF score of 70, and referred Plaintiff to a psychiatrist for "routine" services. (R. 461-63).[5]

Throughout 2013, Plaintiff attended group and individual therapy sessions in prison and displayed "appropriate" mental status in terms of appearance, behavior, mood, affect,

---

[4] "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)). In the Fifth Edition of the DSM, published in 2013, the American Psychiatric Association "abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting DSM 16 (5th ed. 2013)). "A GAF between 41 and 50 indicates 'Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011).

[5] A GAF between 61 and 70 reflects "'some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well.'" *Williams*, 757 F.3d at 613 (quotation omitted).

concentration, memory, speech, and thoughts. (R. 464, 466, 469-70, 589-90).[6] In February 2013, a doctor assigned a GAF score of 50 and restarted medication, which Plaintiff was willing to take once he understood it was for bipolar disorder and could help him sleep. (R. 587). In November 2013, a psychiatrist noted appropriate mental status findings, but found that Plaintiff was not cooperative, not coherent, did not make appropriate eye contact, and had poor insight, judgment, and impulse control. (R. 468). In December 2013, a psychiatrist assigned a GAF score of 60-65. (R. 470).[7]

In 2014, Plaintiff continued to attend group and individual therapy sessions in prison and displayed appropriate mental status throughout the year. (R. 471, 475-76, 495, 498-501, 505-10, 514-16). In March 2014, a psychotherapist noted agitated mood and irritable affect but otherwise appropriate mental status findings. (R. 474). In May 2014, a psychologist observed that Plaintiff was posturing aggressively, guarded/suspicious, and irritable, but noted otherwise normal findings.[8] (R. 479-80, 490). Beginning in June 2014, Plaintiff's treatment plan included a GAF score of 68; and, for the rest of the year, Plaintiff reported no mental health issues. (R. 498-99, 501-08, 511-15). In April, May, and July of 2014, a psychiatrist assigned GAF scores of 60-65 and, in

---

[6]     Citing handwritten treatment notes (R. 469), the Commissioner states that, in December 2013, Plaintiff reported being off medication, but made no complaints other than that his cellmate snored. (Doc. 20, at 3). This Court is unable to read the treatment note in its entirety since several words are illegible, but is able to see the words "off meds", "except" and "snores" so it is possible that the Commissioner's reading of the note is accurate, and Plaintiff does not quarrel with it.

[7]     "[A] GAF between 51 and 60 reflects 'Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" *Jelinek*, 662 at 807 n.1 (quoting DSM 34 (4th ed. text revision 2000)).

[8]     The Commissioner states that the psychologist attributed Plaintiff's anger to being kept in the infirmary. (Doc. 20, at 3, citing R. 494). While the Court is unable to read the entirety of the handwritten note (as some words are illegible), it does appear to say this, and Plaintiff does not dispute the Commissioner's reading.

November, a GAF score of 65-70; the psychiatrist consistently noted no current medications.[9]  (R. 475, 495-97, 500, 509).  In January 2015, Plaintiff displayed appropriate mental status, and he reported no mental health issues.  (R. 517).  Shortly thereafter, he was released from prison.  (*Id.*).

Following his release, Plaintiff applied for DIB and SSI (on January 23, 2015) and also sought services from the Human Resources Development Institute ("HRDI").  In February 2015, a mental health professional assessed Plaintiff, noting apparent moderate impairment of functioning based on his social isolation, finding his prognosis to be fair, and describing a favorable prognosis of a decrease in symptoms through medication and therapy.  (R. 547-48, 555, 579-81).  A complete psychiatric evaluation was scheduled for later that month (R. 555-56, 579), but the record does not include documentation of that appointment.

In April 2015, a case manager completed a Level of Care Utilization System ("LOCUS") assessment to make treatment recommendations, assigning Plaintiff a total score of 19 and requesting Level III Community Support Team services.  (R. 548, 553-54, 574-81).[10]  The LOCUS assessment does not include accompanying findings of

---

[9]     The Commissioner states that, in January 2014, Plaintiff confirmed being off medication since December 2013.  (Doc. 20, at 3, citing R. 471).  The Court is unable to read much of this handwritten treatment note, but does see the words "off his meds" followed by two illegible words and then the word "December".   Again, Plaintiff does not dispute the Commissioner's characterization.   A May 2014 evaluation also states that Plaintiff has a history of refusing medication and that no medication has been ordered since December 2013.  (R. 588).

[10]     Mental health professionals may use the LOCUS tool to determine an individual's service and support needs.  *Gunter v. Berryhill*, No. 3:17-120-JPG-CJP, 2017 WL 5613012, at *9 n.4 (S.D. Ill. Nov. 21, 2017) (citation omitted).  The total LOCUS score was based on component scores in each of the following areas: (a) risk of harm; (b) recovery environment – environmental stressors; (c) recovery environment – environmental support; (d) functional status; (e) comorbidity; (f) recovery and treatment history; and (g) acceptance and engagement.  (R. 575, 577).

specific functional limitations. (R. 574-77). HRDI records also reflect diagnoses of bipolar and antisocial personality disorders and a GAF score of 51, but do not indicate when and by whom those assessments were made or include accompanying findings. (R. 548, 574). The HRDI case manager called Plaintiff twice in May 2015 for routine wellness checks; he reportedly had attended only one group therapy session because he was helping care for his ailing mother (R. 551-52), however, the record does not include documentation of that visit. There are no other treatment notes from HRDI (or any other provider for that matter) after May 2015 through the hearing before the ALJ in May 2017.

## III.  Consultative Examinations

On July 20, 2015, consultative examining physician Ana Gil, M.D. performed a psychiatric examination of Plaintiff. (R. 613-17). Dr. Gil observed that Plaintiff was well groomed, had good hygiene, and wore clothes that were clean and appropriate for the weather. (R. 613). He understood that the purpose of the visit was to evaluate his claim for disability benefits. (*Id.*). Plaintiff reported taking medications, having mood swings, feeling irritable and angry, having rapid speech and racing thoughts, experiencing periods of depression, and having short-term memory impairment. (R. 613-14). His activities of daily living included performing daily grooming and hygiene, making meals, taking public transportation, attending weekly group therapy sessions, paying bills, and keeping up with the news. (R. 614-15).[11]

Dr. Gil found that Plaintiff was cooperative and polite, but he related in a distant manner and displayed poor eye contact, downcast gaze, moderate psychomotor

---

[11] As noted, the record contains reference to a single group therapy session with HRDI. (R. 551-52).

agitation, extreme restlessness, and poor attention span.  (R. 613, 615-16).  Dr. Gil found

that it was difficult to get Plaintiff to concentrate and had to repeat questions and redirect

him throughout the examination.  (*Id.*).  Dr. Gil determined that Plaintiff had a mildly

anxious, sad, irritable, and restricted affect and a moderately depressed mood.  (R. 615-

16).  Plaintiff had flight of ideas and tangentiality, but Dr. Gil found no evidence of thought

process disorder.  (R. 613, 615-16).  Dr. Gil assessed Plaintiff's speech as coherent, but

pressured, hyper-inclusive, loud, and at times irrelevant.  (R. 613, 615).  Dr. Gil diagnosed

bipolar disorder, history of heroin abuse, antisocial personality disorder, and conduct

disorder.  (R. 616).  Dr. Gil concluded that Plaintiff would not be able by himself to handle

any funds awarded.  (R. 617).

Also on July 20, 2015, consultative examining physician Rochelle Hawkins, M.D.

performed a physical examination of Plaintiff.  (R. 602-10).  Plaintiff understood that the

purpose of the visit was to evaluate his claim for disability benefits.  (R. 602).  Dr. Hawkins

noted that Plaintiff was independent with activities of daily living.  (R. 603).  Dr. Hawkins

found that Plaintiff's speech was normal, he was alert and oriented, his grooming and

hygiene were good, his memory was fair, and his judgment was intact.  (R. 603, 605).  Dr.

Hawkins concluded that Plaintiff would need assistance handling his funds.  (R. 605).

## IV.    State Agency Reviewing Physician Opinions

On initial review on August 5, 2015, state agency reviewing physician David

Biscardi, Ph.D. opined that Plaintiff retained the capacity to understand, remember, carry

out, and sustain performance of one- to three-step tasks; complete a normal workday;

interact briefly/superficially with coworkers/supervisors with no public contact; and adapt

to changes/stressors associated with simple routine competitive work activities.  (R. 79,

97).  On reconsideration on December 11, 2015, state agency reviewing physician Kirk Boyenga, Ph.D. rendered the same opinion.  (R. 115).[12]

## DISCUSSION

I.    **Governing Standards**

A.    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete

_____

[12]    This opinion was limited to Plaintiff's SSI application.  (R.115).  For Plaintiff's DIB application, Dr. Boyenga found insufficient evidence to evaluate the claim as of the date last insured of September 30, 2012.  (R. 126).  As noted, the earliest treatment records are from October 2012.

written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).[13] In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four,

---

[13] Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.  Analysis

### A.  Opinion Evidence

Plaintiff first objects to the RFC determination on the ground that the ALJ improperly weighed the medical opinions and failed to explain why treating physicians' opinions were not given controlling weight.  (Doc. 12, at 3-4, 8, 12; Doc. 23, at 4-5).  A claimant's RFC is the maximum work that he can perform despite any limitations.  *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2.  "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions."  *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The problem with Plaintiff's argument that the ALJ incorrectly weighed the treating physicians' opinions is that he has not identified such opinions.  Plaintiff  focuses on the LOCUS score assigned by an HRDI provider, asserting that the ALJ erred by not discussing it.  (Doc. 12, at 4, 6, 7, 9; Doc. 23, at 2-3).  Mental health professionals may use the LOCUS tool to determine an individual's service and support needs.  *Gunter*, 2017 WL 5613012, at *9 n.4.  Although the ALJ considered Plaintiff's treatment with HRDI, including a record reflecting the LOCUS score (R. 25-26, citing R. 575), she did not specifically discuss the LOCUS score.  The parties do not cite, and the Court has not found, any authority requiring that an ALJ address a claimant's LOCUS score.

To the extent Plaintiff claims that the LOCUS score alone is a medical opinion (Doc. 23, at 2-3), that argument is unpersuasive. The Social Security Administration defines medical opinions as "'statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity' of a claimant's impairments, including the claimant's symptoms, diagnosis, prognosis, physical and mental restrictions, and residual functional capacity." *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); 20 C.F.R. § 404.1527(a). Setting aside the question of whether a case manager or other non-physician at HRDI would qualify as an "acceptable medical source," as defined in 20 C.F.R. § 404.1502(a), the LOCUS score alone does not satisfy the definition of medical opinion in any event. The LOCUS assessment was used to make treatment recommendations for Plaintiff, but was not accompanied by findings of his specific functional limitations. (R. 574-77). The LOCUS score in and of itself does not articulate particular mental restrictions resulting from Plaintiff's impairments or his specific residual functional capacity.

If Plaintiff additionally is suggesting that some unspecified treatment note within the 617-page record constitutes a medical opinion, the argument also is unavailing. First, he must at least identify the specific "opinion" in the treatment note for the Court's consideration and provide a record citation. He has not done so.

Second, this Court follows the approach of those courts that have distinguished between treatment notes containing only symptoms and diagnoses, which generally are not medical opinions, and treatment notes providing a "prognosis, what the claimant can still do despite the impairment, and any physical or mental restrictions," which are medical opinions. *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) (not treating

physician's reports as medical opinions where they contained "symptoms and diagnoses, but not a prognosis, a discussion of what [the plaintiff] could do despite her impairments, or an assessment of her physical restrictions.") (citing *House v. Berryhill*, No. 1:17-CV-2109-SEB-TAB, 2018 WL 1556173, at *6 (S.D. Ind. Mar. 30, 2018)) (findings from cardiopulmonary stress test report summarized by a treating physician "strain the regulatory definition of a 'medical opinion.'"). Plaintiff has provided no authority to support the contrary position that a doctor's note describing merely symptoms or a diagnosis amounts to a medical opinion, and this Court is unaware of such authority. Since Plaintiff has broadly referenced only symptoms and diagnoses (Doc. 12, at 3-4, 8, 12; Doc. 23, at 4-5), without pointing to any treatment notes reflecting his prognosis, abilities, or restrictions, the Court rejects this challenge to the RFC.

Plaintiff next claims that the ALJ considered only select findings of consultative examining physician Dr. Gil while ignoring other findings on psychiatric examination with respect to attention, speech, and affect, namely: "extremely restless, poor attention span, affect sad, irritable and restricted, flight of ideas, pressured and hyper inclusive speech at time[s] irrelevant, there was a need to repeat questions and redirect the Plaintiff often." (Doc. 12, at 6-8, 10). The Court disagrees, as the ALJ discussed Dr. Gil's psychiatric examination at length in considering whether a listed impairment was satisfied and in determining Plaintiff's RFC. (R. 20-21, 26-28).

The ALJ recounted Dr. Gil's assessments relating to attention, speech, and affect, including that: it was difficult to get Plaintiff to concentrate; he had moderate psychomotor agitation and poor attention span; he was extremely restless; he had rapid speech; he experienced flight of ideas and racing thoughts; he had mood swings, irritability, and

anger; he related in a distant manner and had poor eye contact and a downcast gaze; his affect was sad, irritable, and restricted; and his mood appeared moderately depressed. (R. 21, 27). That discussion of Dr. Gil's report encompasses not only certain findings of the doctor that Plaintiff claims were overlooked, but other findings that likewise convey mental impairment. Dr. Gil did not, however, offer an opinion of Plaintiff's functional limitations (that was done by Drs. Biscardi and Boyenga). Notably, Plaintiff proffers no evidence to support specific functional limitations resulting from deficiencies of attention, speech, and affect.

Finally, Plaintiff cursorily argues that the ALJ exclusively relied on the state agency reviewing physicians' opinions. (Doc. 12, at 10; Doc. 23, at 6). As discussed above, the record contains no other medical opinions on which the ALJ could have relied. In weighing a medical opinion, the ALJ evaluates its consistency with the record as a whole. 20 C.F.R. § 404.1527(c)(4); *see Sanders v. Astrue*, 879 F. Supp. 2d 930, 940 (N.D. Ill. 2012) ("Where the record does not contain opinion evidence from a treating source, the ALJ may give substantial weight to the state agency reviewing physician opinion consistent with other medical evidence.") The ALJ also considers the medical source's understanding of the disability programs and their evidentiary requirements. 20 C.F.R. § 404.1527(c)(6); *see Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."); SSR 96-6p, 1996 WL 374180, at *4 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [SSA].").

Drs. Biscardi and Boyenga opined that Plaintiff retained the capacity to understand, remember, carry out, and sustain performance of one- to three-step tasks; complete a normal workday; interact briefly/superficially with coworkers/supervisors with no public contact; and adapt to changes/stressors associated with simple routine competitive work activities.  (R. 79, 97, 115).  The ALJ found those opinions to be consistent with the overall medical evidence and noted those sources' specialized knowledge evaluating mental impairments under the standards of the SSA.  (R. 29). Plaintiff does not identify errors or inconsistencies in the state agency reviewing physicians' opinions.  And contrary to Plaintiff's suggestion (Doc. 12, at 10; Doc. 23, at 6), there is no concern that the ALJ relied on outdated opinions, as the state agency reviewing physicians' opinions are the most recent assessments in the record.  *Cf. Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (" . . . ALJ erred by continuing to rely on an outdated assessment by a non-examining physician . . . ")

But that does not end the analysis because here the ALJ accorded the state agency reviewing physicians' opinions "great weight" (R. 28), but adopted certain less restrictive functional limitations not articulated in those opinions.  (R. 22, 28-30).  The RFC specifies that Plaintiff can understand, remember, carry out, and adapt to the pressures of simple, routine tasks and make simple work related decisions on a sustained basis; should never work with the general public; can work in constant proximity to coworkers, but contact should be brief and superficial with no work on joint or tandem tasks; and can tolerate occasional supervisor contact.  (R. 22).

In two significant respects, however, the RFC and state agency reviewing physicians' opinions differ.  First, the RFC findings that Plaintiff can work in constant

proximity to coworkers with no work on joint or tandem tasks and can tolerate occasional supervisor contact (R. 22) are not reflected in the state agency reviewing physicians' opinions. (R. 79, 115). The opinions simply limit Plaintiff to interacting briefly/superficially with coworkers/supervisors (R. 79, 115), but are silent as to both his proximity to and lack of joint or tandem work with coworkers, as well as the frequency (as opposed to duration and depth) of his interaction with supervisors. As such, the RFC subjects Plaintiff to more contact with others than the opinions contemplate, namely being near coworkers all the time albeit without working on joint or tandem tasks, and potentially engaging in prolonged and in-depth interactions with supervisors albeit occasionally. Moreover, the worksheets that the doctors completed and that accompanied their opinions appear to be at odds with the RFC findings. In rating sustained concentration and persistence, they indicate that Plaintiff is moderately limited in the ability to work in coordination with or proximity to others; and, in rating social interaction, they indicate that he is moderately limited in the ability to get along with coworkers. (R. 78, 96). *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("Worksheet observations, while perhaps less useful to an ALJ than a doctor's narrative RFC assessment, are nonetheless medical evidence which cannot just be ignored.").

Second, the RFC finding that Plaintiff can make simple work related decisions on a sustained basis (R. 22) does not appear in the opinions. (R. 79, 97, 115). Indeed, the opinions do not address Plaintiff's decision-making at all. As such, the RFC requires Plaintiff to engage in more decision-making than the opinions address. The accompanying worksheets appear to partially support the RFC finding because, in rating sustained concentration and persistence, they indicate that Plaintiff is not significantly

limited in the ability to make simple work-related decisions; but, nonetheless, they do not state that he can so on a sustained basis. (R. 78, 96) *Cf. Varga*, 794 F.3d at 816.

Remand is therefore necessary since it is unclear how the ALJ arrived at the RFC findings. The decision does not acknowledge much less explain the departures from the state agency reviewing physicians' opinions, and the ALJ identifies no support for the alternate RFC formulation. That is error. *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011) (finding that ALJ erred in relying on state agency reviewing physician's opinion but adopting less restrictive functional limitation without citing supporting evidence); *Denson v. Berryhill*, No. 17 C 2220, 2018 WL 3546739, at *4-6 (N.D. Ill. July 24, 2018) (explaining that ALJ improperly resorted to lay opinion to fill "evidentiary gap" where ALJ rejected treating physician's opinion and state agency physicians did not offer opinions of limitations); *McDavid v. Colvin*, No. 15 C 8829, 2017 WL 902877, at *4-6 (N.D. Ill. Mar. 7, 2017) (finding that ALJ improperly "play[ed] doctor" to fill evidentiary gap created by rejecting state agency and treating physicians' opinions of greater functional limitations where the record contained no other opinion regarding plaintiff's RFC); *Walton v. Berryhill*, No. 1:17-cv-00763-RLY-TAB, 2017 WL 6015807, at *3-4 (S.D. Ind. Nov. 14, 2017) (concluding that ALJ erred in incorporating some functional limitations similar to reviewing physicians' opinions and adopting other less restrictive limitations with "no basis in the record").

Even more problematic is that the RFC and the corresponding hypothetical to the VE failed to account for all of Plaintiff's limitations in terms of concentration, persistence, or pace and social interaction. Although Plaintiff challenges only the hypothetical question (Doc. 12, at 14), "[a]s a general rule, both the hypothetical posed to the VE and

the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt*, 758 F.3d at 857 (citations omitted). While the ALJ need not use the precise language "concentration, persistence, or pace," the court "will not assume that the VE is apprised of such limitations unless she has independently reviewed the medical record." *Id.* The Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Id.* at 858-89 (citations omitted).

Here, the ALJ found that Plaintiff has moderate difficulties of concentration, persistence, or pace and social interaction (R. 21-22, 28), and the state agency reviewing physicians also expressly noted Plaintiff's limitations of sustained concentration and persistence as well as social interaction. (R. 78-79, 96-97). The ALJ crafted the RFC and corresponding hypothetical to limit Plaintiff to: simple routine tasks; simple work related decisions on a sustained basis; no public contact; constant proximity to, but brief and superficial contact with, coworkers with no work on joint or tandem tasks; and occasional supervisor contact. (R. 22, 60-61). As the Seventh Circuit has instructed, limitations of "simple routine tasks" and limited interaction with others are inadequate to convey limitations of concentration, persistence, and pace and temperamental deficiencies. *See Yurt*, 758 F.3d at 855, 858-59 (rejecting hypothetical limiting claimant to performing unskilled tasks without special considerations, relating at least superficially with coworkers and supervisors, attending to tasks for sufficient periods of time to complete them, and not working around large numbers of people). For example, no aspect of the RFC specifies how, if at all, any given limitation accounts for Plaintiff's deficiencies of

18

concentration, persistence, or pace. Notably, the Commissioner advances no argument that the language that the ALJ used in the RFC and hypothetical comply with controlling case law. (*See* Doc. 20, at 10-11.)

For all of the foregoing reasons, the case is remanded for further proceedings consistent with this opinion to reconsider the RFC determination and, based on that finding, consult a VE to evaluate whether Plaintiff could perform past relevant work and other jobs.[14]

### B.    Medical Evidence

Plaintiff next argues that the ALJ failed to consider certain medical evidence in determining the RFC, namely unspecified "marked findings" in the treatment records. (Doc. 12, at 6-9; Doc. 23, at 2, 4-5). Again, Plaintiff fails to direct the Court to specific findings, test results, or diagnoses that he contends the ALJ failed to address, and he simply provides a brief summary of his medical history without citation to the record or (at times) with a collective citation to a 206-page portion of the 617-page record (Doc. 12, at 3-4). This Court is not obligated to search the record for such evidence and declines to do so. *See Friend v. Valley View comm. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) (Seventh Circuit has "cautioned time and again [that] '[j]udges are not like pigs, hunting for truffles buried in [the record].'" (quoting *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *Britney S. v. Berryhill*, 366 F. Supp. 3d 1022, 1027-28 (N.D. Ill 2019).

---

[14]    Plaintiff claims that the hypothetical to the VE also fails to address his anxiousness, flight of ideas, and pressured speech (Doc. 12, at 14-15), but cites no authority for the proposition that a hypothetical must include such clinical findings. As for the assertion that the ALJ did not consider Dr. Gil's findings concerning Plaintiff's affect, the ALJ expressly noted Dr. Gil's observation of his sad, irritable, and restricted affect (R. 21, 27, 613, 615-16). While the ALJ omitted the phrase "mildly anxious" from that description, an ALJ is not required to "'provide a complete written evaluation of every piece of . . . evidence.'" *Pepper*, 712 F.3d at 362.

To the extent Plaintiff relies on general evidence of diagnosis and treatment, this fails to demonstrate that the ALJ's RFC determination is flawed or that Plaintiff is disabled. Here, the ALJ considered Plaintiff's treatment records, diagnoses, medications, and course of treatment, but they are not in and of themselves evidence of Plaintiff's functioning. *See, e.g., Dianna K. v. Berryhill*, No. 1:17-CV-2568-TWP-MPB, 2018 WL 4560674, at *6 (S.D. Ind. Sept. 24, 2018) ("[P]ointing to a diagnosis alone is insufficient to establish the existence of functional limitations.") Plaintiff even suggests that the ALJ should have "infer[red] . . . many limitations naturally resulting from" schizoaffective and depressive disorders (Doc. 23, at 7), but adduces no evidence of specific functional limitations resulting from his mental impairments documented in the treatment records.

Lacking such evidence, Plaintiff focuses on the GAF scores. While he acknowledges that the ALJ discussed the GAF scores assigned by IDOC and HRDI providers, Plaintiff generally criticizes that discussion. (Doc. 12, at 7 n.5; Doc. 23, at 5). Plaintiff does not, however, identify specific flaws in the ALJ's analysis of the GAF scores, and the Court finds none. "Courts have explained again and again that GAF scores do not always reflect a psychiatrist's assessment of the claimant's functional capacity." *Stone v. Colvin*, No. 13 C 5171, 2015 WL 2265793, at *3 (N.D. Ill. May 13, 2015). "'GAF scores are intended to be used to make treatment decisions . . . not as a measure of the extent of an individual's disability.'" *Id.* (quoting *Martinez v. Astrue*, No. 09 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010)). GAF scores measure both severity of symptoms and functional level. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Because the final rating "always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity." *Id.* (internal quotation omitted). Accordingly,

the regulations and case law do not require an ALJ to make a disability determination based solely on a claimant's GAF score. *Id.*

Consistent with the foregoing authority, the ALJ here addressed the limited utility of GAF scores and explained that, generally, she accords a GAF score less weight because it represents a clinician's subjective evaluation at a single point in time, it may vary from one time to another or between practitioners, and it is not designed for adjudications. (R. 26). The ALJ first considered the consistent GAF scores of 60 or 68 while Plaintiff received treatment at the IDOC. (R. 25-26). The ALJ also considered the GAF score of 51 when Plaintiff subsequently sought services from HRDI and noted the lack of accompanying objective findings. (R. 25-26).

Ultimately, the ALJ gave more weight to the consistent GAF scores of 60, reflecting at most moderate difficulties in functioning, than to the outlying lower score of 51 and higher score of 68. (R. 26).[15] And the ALJ noted that Plaintiff consistently was off medication for his mental impairments without complications while receiving treatment at the IDOC and stopped attending treatment at HRDI. (R. 25-26). The treatment records and hearing testimony on which the ALJ relied support those findings. (R. 25-26, 28 citing R. 459-60, 470-72, 479-80, 489-90, 498-518, 556, 574-76; *see* R. 46, 49-51).[16] In the end, Plaintiff points to no evidence of more than the moderate functional limitations that the ALJ found.

---

[15] The ALJ did not mention other outlier GAF scores of 50 and 70 (R. 459, 463, 587), but Plaintiff does not claim that is an error warranting remand (*see* Doc. 12, at 7 n.5; Doc. 23, at 5).

[16] Plaintiff testified that he went to HRDI to get "cleared" to work, but stopped going there because after more than a year he still had not received that clearance. (R. 46, 49-51). As noted, the HRDI records indicate that Plaintiff only showed up for a single group therapy session and said he did not attend others because he needed to care for his mother. (R. 551-52).

## C.     Subjective Symptoms

In determining the RFC, the ALJ additionally evaluated Plaintiff's subjective allegations of mental impairment.  (R. 22-23, 25-28).  Plaintiff generally contends that the ALJ erred in doing so, but does not elaborate.  (Doc. 23, at 7).  Instead, Plaintiff simply claims that the ALJ improperly relied on her observation of his participation in the hearing.  (*See* Doc. 12, at 11, citing R. 19).  Plaintiff also generally asserts that the ALJ improperly equated his ability to perform activities of daily living with the ability to work.  (Doc. 12, at 12, citing R. 19-20).  The Court finds that the ALJ properly evaluated Plaintiff's subjective allegations of impairment.

The regulations describe a two-step process for evaluating a claimant's own description of his impairments.  SSR 16-3p, at *2.  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain."  SSR 16-3p, at *3.  Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . ."  *Id.*  In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong."  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Summers v. Berryhill*, 864 F.3d 523, 528

(7th Cir. 2017) (internal quotations omitted).  A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).  The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong." *See Horr*, 743 F. App'x at 20.

The ALJ used Plaintiff's participation in the hearing and reported activities of daily living to assess his described limitations and mental impairments.  (R. 19-22, 27).  In considering whether a listed impairment was satisfied, the ALJ discredited the extent of Plaintiff's claimed limitations with respect to understanding, remembering, or applying information based in part on his participation in the hearing, finding that those limitations were inconsistent with the ALJ's observation that Plaintiff answered questions appropriately at the hearing and displayed no apparent difficulties understanding and attending to the hearing content.  (R. 20).  The ALJ also found such limitations inconsistent with: (a) the absence of treatment records reflecting any difficulties understanding treatment recommendations, maintaining conversation in the treatment setting, or asking appropriate questions (R. 20); and (b) Plaintiff's understanding on consultative examination that its purpose was to evaluate his claim for disability benefits (R. 20).

In determining Plaintiff's RFC, the ALJ also discredited the degree of Plaintiff's claimed  mental impairments based in part on his activities of daily living (as reported to consultative examiners Drs. Gil and Hawkins), finding that those impairments were inconsistent with his ability to dress, perform grooming and hygiene, make meals, take public transportation, attend weekly group therapy sessions, pay bills, and keep up with

the news. (R. 21, 27). The ALJ also found the claimed degree of such impairments inconsistent with: (a) the treatment records consistently noting appropriate findings, lack of significant issues, and largely normal mental status examinations (R. 25); (b) the conservative course of treatment, including consistently being off medications without complications during treatment at the IDOC and, after his release, discontinuing treatment at HRDI (R. 23, 25, 28); and (c) his history of sporadically working at a competitive level in 2002, 2003, 2005, and 2008 (R. 30). In addition, the ALJ noted that Plaintiff stopped working in 2009 for reasons unrelated to impairment. (R. 22). The ALJ further found that Plaintiff's denial of a history of substance abuse on a questionnaire, contrary to other record evidence, diminished his overall reliability. (R. 27).

Nothing about those findings is patently wrong. Plaintiff does not address those aspects of the ALJ's decision much less identify specific errors that the ALJ purportedly made in discounting Plaintiff's claimed limitations. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived . . .") Plaintiff's blanket assertion that the ALJ failed to cite the record in support of her determination (Doc. 23, at 4) is inaccurate. Indeed, the ALJ's decision includes citations to treatment notes (R. 25-26, 28), consultative examination findings (R. 20-21, 26-28), medical opinions (R. 28-29), and other evidence (R. 19-21, 29-30).

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand (Doc. 11) is granted as outlined above, and the Commissioner's Motion for Summary Judgment (Doc. 19) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed,

and the case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated: November 19, 2019

_____
SHEILA FINNEGAN
United States Magistrate Judge